Sedgwick *v.* Stanton.

---

## SEDGWICK *vs.* STANTON.

S. being in the possession of a lot of land at Syracuse, the fee of which was in the state, but to which S., under a law passed in 1848 had a pre-emptive right, by virtue of his possession and the fact that he had made improvements thereon, of the value of $200, applied to the commissioners of the land office for the title, but could not obtain it, for the reason that one of the canal commissioners supposed the land might be required for the enlargement of the Erie canal. An agreement was then made, between S. and T., by which T. undertook to procure the necessary evidence of S.'s pre-emptive right, to satisfy the commissioners of the land office that the land was not required for canal purposes; to obtain, at his own expense, a title to the lot, for S.; and to share equally the purchase money to be paid therefor. In consideration of which S. agreed to convey to T. an undivided half of the lot, when he should receive his deed. This agreement was fully performed by T., and S. received a conveyance of the land, from the state. The contract was subsequently assigned to the plaintiff by T. by a deed of trust, authorizing the grantee to take into his possession the property thereby conveyed, and sell and dispose of and convey or assign the same, and pay certain demands owing by T.

*Held,* 1. That the contract between S. and T was not void, as being against public policy, but was valid and binding upon the parties; and having been fully performed on the part of T., and S. enjoying the fruit of T.'s services, that it could be enforced against S., and a specific performance decreed.

2. That by the assignment to the plaintiff, contained in the deed of trust executed by T., the plaintiff was invested with all the rights of T. in the contract, and in the land therein described, subject to the trust, and that he was entitled to demand a specific performance of it, in the same manner that T. could have done, had it remained in his hands.

3. That the trust was an express trust, fully authorized by the 55th section of the act in relation to uses and trusts, and vested the whole estate in the trustee, subject to the execution of the trust.

THIS was an appeal by the defendant, from a judgment entered at a special term of the court, after a trial at the circuit. The complaint alleged that on the 14th day of October, 1851, an agreement was entered into between one Joseph M. Trowbridge and the defendant, Sidney Stanton, under their hands and seals, which is in the words following :

" This agreement, made October 14th, 1851, between Sidney Stanton and Joseph M. Trowbridge, both of Syracuse, N. Y., is for the following purpose, and upon the conditions hereinafter named : 1st. Said Trowbridge undertakes, at his own expense, to obtain for said Stanton, title from the state of New-York to the lot on Salina street in this city, now used and occupied by him for a stone yard, the same being known as lot No. 2 in Block J of the lots surveyed for the state by Benjamin F. Green, in 1848 or 1849. 2d. Said Stanton agrees to convey to said Trowbridge, by a good and sufficient conveyance, in consideration of his above mentioned expense and trouble, one undivided half of the said lot, free from incumbrance or lien, except for the purchase money. 3d. Both parties agree to share mutually the cost or purchase price to be paid the state therefor. 4th. Should said Trowbridge be enabled to procure for said Stanton the purchase or title from the state of any greater or less quantity of land adjoining the above mentioned lot than is contained therein, then this agreement is to extend to and cover the same, be it more or less."
That the defendant had, for some time previous, occupied this lot and claimed a pre-emption under the act of the legislature, passed in 1848, in relation to the disposition of certain lands of the Onondaga Salt Springs Reservation,(a) but had been, on account of certain difficulties attending his claim, unable to procure a recognition of his right, and therefore entered into this agreement. That Trowbridge procured a meeting of the commissioners of the land office, and appeared before them ; when they passed a resolution directing a surveyor general's certificate to issue, declaring Stanton's right to a patent, on paying the purchase price of the lot. That Trowbridge paid to Stanton, on the 30th of June, 1853, $85, being one half of the amount to be paid down on the issuing of

(a) Laws of 1848, p. 466, ch. 346.

Sedgwick *v* Stanton.

the certificate; and on the 23d day of July, 1853, $325.63, being one half of the remaining sum going to the state. That no certificate was issued, but Stanton paid in the purchase money to the state, and procured a patent, on the 21st day of July, 1853, in pursuance of a resolution of the commissioners of the land office, which he still holds. That Trowbridge performed all the conditions of the agreement on his part, and was entitled to a conveyance from Stanton of the undivided half of the lot. That on the 27th of July, 1853, Trowbridge and wife, among other real estate, conveyed to the plaintiff this agreement, in trust to take possession of the property conveyed, and dispose of the same, and with the proceeds pay a certain note made by Trowbridge for $1,017.50, and indorsed for the accommodation of Trowbridge, and discounted at the Crouse Bank : in case the note was paid by either of the indorsers, to indemnify him therefor, or in case Trowbridge paid it, then to reconvey to him the property. The complaint then alleged, that before the making of the deed of trust, Trowbridge called upon Stanton for the conveyance of the undivided half of said lot, which the defendant on various and unjust pretenses refused ; and that he had since been trying to sell the lot. The plaintiff asked for a specific performance of the agreement.

The answer alleged that the clause in the agreement in reference to the amount to be paid the state by the respective parties, was, that both should share mutually the cost or purchase money to be paid the state, instead of the purchase price, as stated in the complaint. That prior to the making of the agreement, the lot in question had been laid out in pursuance of the act referred to, and was worth $4,000. That appraisers had been duly appointed, who had duly appraised the value of the lot at $680, and Stanton had performed all the conditions and complied with all the provisions of the act, and was entitled to become the purchaser of the lot at its appraised value. The answer denied that the defendant was unable to procure the recognition of his preemption on account of certain difficulties attending his claim, and averred that the commissioners of the land office did not deny such right, but postponed their action because the apprisers had,

in their opinion, put too low a valuation upon the lot. That, before the making of the agreement, Trowbridge had represented to the defendant that he had been employed to survey the lands referred to in the act, and could, in his capacity of surveyor, manage to procure title to the lot in question, and also on very favorable terms the title to another piece adjoining, 40 feet front and of equal depth with this lot; and on account of such representations, the defendant was deceived and induced to enter into the agreement. That Trowbridge failed to procure title to the piece adjoining this lot, and knew at the time of his making such representations. that they were false, and that he could not procure such title. The answer denied knowledge of the performance of the services or conditions by Trowbridge mentioned in the complaint; and alleged, that after the resolution of the commissioners of the land office was passed, the state engineer absolutely refused to issue or grant any certificate whatever relative to the lot, and Trowbridge thereupon abandoned his efforts to procure the title, and, with his consent, the defendant resumed the burden upon himself of obtaining the title, went to Albany, was there engaged several days in pressing his claims upon the attention of the commissioners, and at length procured their direction for the patent to issue. That the resolution of the commissioners was of no avail whatever, and that he procured the title himself instead of Trowbridge. That the services of Trowbridge were valueless, and together with the money paid by him, were not an adequate consideration for the conveyance demanded. That before the making of the agreement, the defendant was in a position where he could have compelled the execution of the proper evidence of his title to the lot. The answer denied any knowledge of the deed of trust to the plaintiff, and denied that the defendant had refused to execute the deed tendered him under various or unjust pretenses ; and insisted that Joseph M. Trowbridge was alone entitled to enforce a specific performance, and was the real party in interest.

The cause was tried at the Onondaga circuit, in November, 1853, before Justice Pratt, without a jury. After hearing the evidence, the court decided that the contract was a valid and

binding contract, and decreed a specific performance by the defendant.

*J. Ruger*, for the appellant.

*G. F. Comstock*, for the respondent.

*By the Court*, BACON, J. The facts found by the court, upon which the only questions arise, which counsel deemed it important to discuss in this case, are stated as follows: 1. That on the 14th day of October, 1851, the agreement, a copy of which is set out in the complaint, was duly executed by and between Joseph M. Trowbridge and Sidney Stanton, the defendant. 2. That prior to the making of said agreement, the defendant had claimed a pre-emption right to the lot in question, under the three hundred and forty-sixth chapter of the session laws of 1848, and had made efforts from time to time to have such claim allowed by the commissioners of the land office, who had hitherto declined to allow such claim, for the reason that canal commissioner Cook had suggested that the lot might be necessary for the use of the canal. 3. That after making such contract, the said Joseph M. Trowbridge took the necessary proceedings for satisfying the commissioners of the land office that the lot was not necessary for the use of the canal, and that Stanton was entitled to his pre-emption right; and for that purpose procured and laid before them the certificate of the division engineer that it was not wanted for the canals, and also the certificate of the salt superintendent that it was not necessary for the salt springs, and did all other things necessary for procuring the allowance of said Stanton's claim, and duly performed all the stipulations and covenants on his part in said agreement to be performed. And that on the 24th day of June, 1853, the claim of said Stanton, in consequence of these proceedings, was formally allowed by the commissioners of the land office, and a resolution passed by them, directing the state engineer to issue to the defendant a certificate for said lot, upon the usual terms. 4. The purchase money to be paid for the lot was $680, and interest, of which one-fourth was to be paid down, being $170. This sum was paid by the de-

fendant, one half of which was repaid by Trowbridge to the defend-
ant, and received by him.   5.. No certificate was issued by the
state engineer, under the resolution, to the defendant; but after-
wards, and previous to the 21st day of July, 1853, it was con-
cluded by the said Trowbridge and the defendant to pay up the
whole amount to the state, and take a patent instead of a certifi-
cate, for the lot; that on that day the defendant went to Alba-
ny, paid the entire amount, and procured a patent for the lot in
the usual form, which he now holds.   6. That after the defend-
ant's return from Albany, and on the 23d day of July, Trow-
bridge paid to the defendant $350, being one half of the amount
paid by the latter upon receiving the patent, and some $24.37
in addition, which was received by the defendant.   7. That on
the 27th day of July, 1853, Trowbridge and wife executed to
the plaintiff the trust deed, a copy of which is set out in the
case, embracing the contract between Trowbridge and Stanton;
and that before the commencement of this suit the defendant
had been requested on behalf of both Trowbridge and the plain-
tiff to convey the one half of said premises, according to the
stipulations in said contract, which the defendant declined to do.
And upon the facts so found, the judge who tried the cause held
and decided as matters of law, that the said contract was a good,
valid and mutual contract, and one which ought to be specifically
enforced against the defendant; that the aforesaid instrument or
conveyance in trust to the plaintiff, conveyed to him all the right
of Trowbridge in and to the contract, and in and to the lands
and premises therein described, subject to the trust therein spe-
cified, and that the plaintiff was entitled to call for the specific
performance of said contract, and to maintain this action, and
that the defendant was bound to perform said contract specifi-
cally, and to execute to the plaintiff a conveyance in due form of
law for an undivided half of the aforesaid premises.

   To these conclusions of law, and the judgment directed to be
entered in conformity therewith, the counsel for the defendant
excepts, and insists,

   I. That the agreement between Trowbridge and the defend-
ant, by which the former, upon obtaining at his own expense a

Sedgwick *v.* Stanton.

confirmation of the defendant's title to the lot mentioned in the complaint, was to be entitled to a conveyance from the defendant of an undivided half thereof, was contrary to public policy, and therefore void. It was intimated, although not very seriously argued under this point, that the agreement in question was champertous, and therefore incapable of enforcement by the legal tribunals. It is sufficient to say, however, that the transaction in question does not come in any respect within the definition of this offense, as contained in the revised statutes. (2 *R. S.* 691, § 6.) Nor is it obnoxious to the common law inhibition of a stranger agreeing to assist in embroiling his neighbors in litigation, or in carrying their suits through the courts, upon a stipulation to share the fruits of the litigation as a reward for his mischievous interference. But the more serious inquiry is whether this agreement is against public policy.

The counsel for the defendant insists that the effect of this agreement, if upheld, is to bring to bear upon a public body charged with superintending and protecting the interests of the state in the lands owned by them, or which may be necessary for public purposes, an illegitimate and possibly a corrupting influence, and to prevent free, untrammeled and independent deliberation and action in respect to questions of this nature.

It is important to see, in the first place, what the object was to be effected through the agency of Trowbridge, and then to ascertain the means and appliances used for its accomplishment. The defendant was in the possession of a lot of land at Syracuse, the fee of which, as I understand, was in the state, but to which the defendant, under the law of 1848, had a pre-emptive right, by virtue of his possession, and the fact that he had made an improvement thereon of the value of $200. He made application for the title, but could not obtain it, for the reason that one of the canal commissioners supposed it might be required for the purposes of the canal enlargement. In this stage of the case the agreement in question was made, by which Trowbridge undertook to procure the necessary evidence of the defendant's preemptive right, to satisfy the commissioners of the land office that the land was not required for canal purposes, to obtain at his

own expense a title to the lot for the defendant, and to share equally the purchase money to be paid therefor. In consideration of all this, he was to be entitled to a conveyance from the defendant of an undivided half of the lot when the defendant should receive his deed. The court find all the facts stated in the complaint to be substantially proved, and that Trowbridge fully performed his agreement.

When we turn to the evidence, to see what were the means and appliances resorted to by Trowbridge, we find that he procured a certificate of the division engineer that the lot was not wanted for canal purposes, and also of the salt superintendent that it was not necessary for the salt springs ; carried on a correspondence in reference to the requisite proof with a clerk in the state engineer's office ; had interviews with members of the land office board ; appeared before them and advocated the claim in their public session, and obtained the passage of a resolution by the board authorizing a conveyance of the lot to the defendant, and the same was subsequently made to, and received by, the defendant. There was also presented to the board, before their final action, a memorial, signed by several inhabitants of Syracuse, recommending that the conveyance be made to the defendant. These are the acts which it is insisted were unfavorable to the exercise of a fair and independent judgment on the part of the public officers charged with the duty of acting upon the application ; and the tendency to such results, it is urged, should induce the courts to frown upon all such agreements, and pronounce them invalid, as contravening public policy. And the recent case of *Harris* v. *Roof's Executors* (10 *Barb.* 489) is invoked as a decisive authority on this point. I do not desire to be considered as dissenting from the opinion of Justice Hand in that case. I concur fully in its high-toned morality, although it has perhaps carried the principle supposed to be involved to the extremest point—"*usque ad apicem juris.*" There were, however, certain features in that case which served to throw great discredit upon the transaction, and cast upon the acts resorted to, to bring about the desired result, the stigma of indirection, if not the odor of possible corruption. The claim which the plain-

Sedgwick *v.* Stanton.

tiff in that case undertook to lobby through the legislature was a very antiquated and stale one ; it was for a pretended interest in lands granted a century ago, and of which none of the parties pretending to have an interest therein had ever been in possession. The business of the plaintiff seems to have been to hang around the purlieus of the capitol, to labor privately with the members and the attorney general, to mouse among the public documents for papers to which he should not have been allowed private access, to have the matter referred " under his charge," and to get up a report for the committee. In view of developments of this character, I find no great difficulty in saying with Justice Hand, that " such practices would have a tendency to prevent free, honorable and correct deliberation and action of this most important branch of sovereignty," and that good public policy does not require our courts to enforce contracts of this nature.

To stigmatize, however, the end to be effected by the acts of Trowbridge and the means resorted to, to accomplish them in this case, as equally obnoxious to censure, is, it seems to me, to confound all just distinctions. It is not questioned on any side that the claim in this case was a just and meritorious one. To secure its approval, it was only necessary to present to the public officers the proper and authentic evidence that the defendant was entitled to the pre-emption claimed, and that the land was not needed for any purposes inconsistent with the right of the defendant, which it was conceded was paramount to all but that of the public. This evidence was obtained from proper sources, and we are bound to suppose, in the absence of all evidence to the contrary, by lawful means. It was openly and publicly used ; information was communicated to the board ; the claim advocated before the body, and their action invoked and obtained on a subject on which it was their express duty to act. Now to insist that a party, having such a claim before a public body, whose action is necessary and should be an informed and intelligent action, shall employ no agent, furnish no documents, engage no counsel, or, if he does, stipulate for no remuneration whatever, is to hold a rule far more stringent than any princi-

ple of public morality requires, and much beyond what any adjudicated case has yet sanctioned. It is restricting the right of the applicant for justice unreasonably, and depriving him of aid which, properly employed, may be essential to his success, and it is casting an imputation upon bodies charged not less to protect the interests of the public than to confirm the citizen in his established right, which I should hesitate to sanction. It is supposing them to be peccable, and open to influences which all upright men hold in utter abhorrence. When all is said and done, confidence must be reposed somewhere; and while all proper shields and protections should be thrown around the action of public men, we should not exclude them from all access to the light, lest perchance it might, in some supposable case, shine too brightly around them. Upon the whole, therefore, I see nothing in the case before us that requires the court to pronounce the agreement void as against public policy. It has been strictly performed by the party who made the contract; the defendant has had the full benefit of his services, he retains the money he has received, and he holds the land for which one half the purchase money has been advanced by Trowbridge; and in violation of his agreement, and, as I think, of good conscience, he refuses to acknowledge his obligation, and sets the plaintiff at defiance. The law ought not to aid such a defense, unless the reasons of public policy that command it are controlling and overwhelming. I see in this case no such reasons, and I am unwilling to countenance private dishonesty upon the pretended plea of a scrupulous regard for public morality, and a tender solicitude for the reputation of our public men. In view of such an interposition, from such a quarter, well might the latter exclaim,

> "*Non tali auxilio,*
> *Nec defensoribus istis nos eget.*"

II. It is urged, in the second place, that the plaintiff in this suit, who is the assignee of Trowbridge, has no right to ask for a specific performance of the contract; that the assignment to him conveyed nothing but a power in trust, which extended no farther than to authorize him to sell the contract, and gave him

Sedgwick *v.* Stanton.

no remedy upon it. It seems to me, however, that this is not a fair interpretation of the assignment. It purports to convey to the plaintiff, among other things, the contract in question in this case, upon certain trusts, to wit, to take into his possession the property thereby conveyed, and sell and dispose of and convey the same, on such terms as he shall deem best, and pay certain demands ; full power being given him to sell the property for cash or upon credit, and to convey or assign the same by proper and sufficient instruments of conveyance. By this assignment, the plaintiff was invested with all the rights of Trowbridge in the contract, and he was entitled to enforce it in the same manner that Trowbridge could have done, had it remained in his hands. It is an express trust, fully authorized by the 55th section of the act in relation to uses and trusts, (1 *R. S.* 728,) and vested the whole estate in the trustee, subject to the execution of the trust. (1 *R. S.* 729, § 60.) The plaintiff could only execute the trust by obtaining title to the lands, and then disposing of them and applying the proceeds as directed by the assignment. A sale of the contract, simply, would give the vendee no greater right than the assignee ; and if he has no power to call for a specific performance of the contract, then the defendant could forever escape from its obligations. But it was properly held by the court, that the conveyance in trust, to the plaintiff, conveyed to him all the right of Trowbridge in the contract, and to the lands therein described, subject to the trust, and authorized him to demand a specific performance of the contract.

It results, therefore, that the judgment of the special term must be affirmed.

[ONONDAGA GENERAL TERM, October 2, 1854. *Hubbard, Pratt* and *Bacon,* Justices.]